**WESTERCHIL CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 694–85C.

United States Claims Court.

April 27, 1989.

Donald Sharp, Alexandria, La., for plaintiff.

J. Keith Burt, Washington, D.C., with whom was Asst. Atty. Gen., John R. Bolton, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

Plaintiff, Westerchil Construction Co., contracted with the United States, acting through the Department of the Navy, Civil Engineer Corps, for the construction of an aircraft maintenance control building. Westerchil later subcontracted construction of the roof to Karnes Roofing Company

(Karnes). After the original roof was 80 to 90 percent complete, the United States determined that it had been unsatisfactorily constructed and ordered Westerchil to remove and rebuild the roof. Westerchil directed Karnes to perform the task; Karnes did so under protest. Westerchil then filed a claim with the contracting officer for an equitable adjustment, requesting reimbursement for the extra costs billed by Karnes for compliance with the alleged change. The basis of Westerchil's claim was that the roof was repairable, thus it need not have been removed and replaced. The contracting officer denied Westerchil's claim and shortly thereafter Karnes successfully brought suit in the United States District Court for the Western District of Louisiana against Westerchil and its surety pursuant to the Miller Act, 40 U.S.C. § 270b (1982).[1] *United States ex rel. Karnes Roofing Co. v. Westerchil Constr. Co. and Federal Ins. Co.*, No. 83–2893A (W.D.La. June 25, 1986). The district court found the government's witnesses to be without credibility and totally arbitrary in their determination that the original roof was so defective as to require its complete removal and replacement at plaintiff's expense. Karnes recovered from Westerchil all of its earned expenses, travel, other overhead, lost profits, and court costs, amounting to $57,250.92, including interest. It is the recovery of those costs that Westerchil now seeks from the United States.

## FACTS

On April 20, 1982, Westerchil executed a fixed-price contract with defendant for the construction of an aircraft maintenance control facility at England Air Force Base, Alexandria, Louisiana. Westerchil subcontracted construction of the "built-up" roof of the facility to Karnes. Built-up roofs are flat and built at a slight incline or inclines to augment drainage. The roof in question was to be constructed on a metal roof decking with four layers of roofing

---

**1.** Subsection (b) of 40 U.S.C. § 270b provides that "[e]very suit instituted under this section shall be brought in the name of the United States for the use of the person suing in the

United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit...."

felt laid over a layer of one and one-half inch perlite insulation, using hot asphalt for lamination of the felt layers, followed by a heavier layer of asphalt (the glaze coat), and topped with a double coat of gravel.

Paragraph 7 of the Roofing Specifications [2] set forth the steps to be followed in the construction of the roof, to wit:

The application of all plies of roofing felts, excluding surfacing, shall be completed in one operation. After the last ply of felt has been applied, top surfaces shall be glaze-coated and the specified top pouring and surfacing withheld until all other trades have completed their work on the roof and the roofing inspected for damage, repaired and approved. The top surfacing shall then be applied as soon as practicable. Upon completion of each day's work, all exposed felts, including base sheets, shall be protected with a glaze coat of hot bitumen applied at the rate of not less than 25 pounds per 100 square feet. In all procedures in which hot bitumen is used in the bonding of materials to each other, or in laminating plies of felt into composite membrane, the operation shall be such that the application of the material which is laid into the bitumen shall follow immediately behind the application of the hot bitumen. There shall be no working ahead with the bitumen. The bitumen must be completely fluid, with mop temperatures within the range specified ... at the instant the superimposed material comes into contact with the bitumen. Felts and top surfacing shall be embedded in, not laid on, the bitumen. Application of bitumen between membrane plies shall be such as to produce voidless coverage and complete penetration of the bitumen both into the felt above and into the felt below. As sheet materials are being rolled into the hot bitumen, they shall be immediately and thoroughly broomed down to eliminate any air which might have been trapped and to provide

tight, smooth laminations without wrinkles, buckles, kinks or fish mouths. Complete application of the roofing system shall be without pockets and blisters....

The quoted language of paragraph 7 literally directed the entire roof to be completed "... in one operation." That was not the case. The contract required that the contractor completely finish each "portion" of the the roof at one time, *i.e.,* Karnes was to select a section of the roof that could be completely roofed in one day, but for the final coat. "Completed" meant installing insulation and laying four plies of roofing material, including the glaze coat, and any other contractual requirements for the selected portion, such as the installation of flashing. One of defendant's witnesses testified that the contract

... prohibited what's known as a phased roof. Where the contractor puts on the insulation and base sheet over the entire roof and then comes back and starts putting on the roofing plys [sic]. From a point that he starts on a particular day from the roof pan on up he's to complete that up to the glaze coat in that day; and then provides [sic] some waterproofing actions to get through the night.

Paragraph 5 of the Roofing Specifications gave plaintiff the option of using asbestos, organic (asphalt), or fiberglass roofing felt plies. Mr. Steve Karnes, President of Karnes Roofing Company, testified that he attended a pre-roofing meeting late in the summer of 1982 at England Air Force Base at which the installation of roofing felts was discussed. Several civilian construction engineers and inspectors employed by defendant also attended. A film was shown which explained how to successfully construct a built-up roof using asbestos felt. Mr. Karnes testified that he informed Mr. Richard Primeaux, a supervisor/civil engineer in the office of the ROICC,[3] that the information presented in

**2.** All references to paragraphs in the contract, unless otherwise stated, are in Section 07000, the technical specifications for the built-up roof.

**3.** The Resident Officer in Charge of Construction (ROICC) was the on-the-scene representative of the contracting officer. The contracting

the movie was not entirely pertinent to his method of built-up roof construction. Mr. Karnes stated that he intended to use 15–pound asphalt saturated felt commonly known as "organic felt" and that at least part of the procedures outlined in the film would be improper for use on that type of ply. Mr. Karnes understood Mr. Primeaux' response to be, "we will follow the specifications." The major construction difference between the use of organic and asbestos felts, according to Mr. Karnes based upon his experience and the manufacturer's data, was that organic felt must be covered with gravel weekly, and preferably at the end of each working day, to provide sufficient weight to prevent the edges of the felt from curling and to provide protection from the sun, which would break down the asphalt in a short period of time; whereas asbestos felt did not require daily gravelling. The contract required that gravel be laid "as soon as possible."

When Karnes began roofing in mid-December 1982, another inspector, Mr. Robert Gutweiler, who also attended the pre-roofing conference, refused to let Karnes apply gravel at the end of the day because, per Mr. Karnes, "it gets in the way, you track it everywhere." Karnes continued to apply the organic felt without covering it on a daily basis with gravel. Gravelling became an issue at trial when it was disputed that the lack of gravel contributed to the deterioration of the defective roof. Interestingly enough, the replacement roof, also built by Karnes using organic felt, was not gravelled daily, or even weekly, and suffered no damage during construction. Mr. Gutweiler permitted Karnes to gravel the second roof daily, but Karnes chose not to. In fact, the second roof was not gravelled until some time between ten and thirty days after the final glaze coat was applied. The only difference between the two roofs was that the first roof was begun in December 1982 and received 9.44 inches of rainfall while incomplete and unprotected, whereas the second roof was built in the summer of 1983 and received no rainfall during the time it was incomplete.

Various other difficulties arose throughout the course of the roof construction. Paragraph 6.2 of the contract specified that all drains, cants, etc., but not crickets, must be in place, inspected for compliance and, if necessary, repaired, prior to installation of the roof. "Crickets," slight pitches to the roof, are designed to permit water to run freely to troughs and thence to drains, instead of ponding on the roof. Ponding is critical because it causes oxidation of the felt plies resulting in the eventual breakdown within a short period of time; perhaps as short as six months. No crickets were ever installed on the roof. Karnes apparently intended to install the crickets on top of the final ply, as permitted, but testified that both Mr. Gutweiler and Mr. Primeaux directed him to not install the crickets in that manner. Defendant argued that Karnes simply forgot to install the crickets. Mr. Gutweiler testified that he suggested to Westerchil that the problem could be rectified by constructing the crickets with sloped gravel and asphalt laid on top of the plies. He emphatically denied "ordering" plaintiff to construct the crickets other than as shown in the plans. Mr. Karnes felt he had been directed to build the crickets as Mr. Gutweiler described to him and that the "order" was a change never reduced to writing or handled as a change under the terms of the contract. Nonetheless, the crickets were never installed. While crickets were not at issue and nothing more need be said of them, the discussions were indicative of the lack of communication and personality conflicts that were extant throughout the construction and removal of the first roof.

The contract also called for the installation of flashing as the work progressed. Paragraph 6.1. Flashing accomplished several purposes, the most important being to prevent water from running under the roofing plies. Flashing is finishing material that overlaps the perimeter of the built-up roof where it hangs over, or up and over, the side of walls. Under the contract, two opposing edges of the roof were to lie flat with the top of the walls. The walls

officer was located in Charleston, South Car- olina.

were to rise at least several inches above the level of the roof at the other two opposing edges. The latter edges were the "parapet" walls of which more will be said. Paragraph 6.1 placed upon Westerchil the responsibility of coordinating the work on the contract so that the parapet walls would be completed in time for Karnes to apply the flashing. The parapet walls, however, were not finished before or during the time the roofing plies were laid. The contract also called for the installation of asbestos flashing, but by the time construction of the roof began, the use of asbestos flashing had become prohibited for health reasons. Mr. Karnes testified that he explained to the inspectors that asbestos flashing was not obtainable and asked for permission to use fiberglass flashing. Karnes and Westerchil were notified that such a request needed approval, but Karnes could proceed and install the fiberglass flashing at its own risk. Because of the dispute over the use of fiberglass flashing and because Westerchil had not completed the parapet walls when Karnes was prepared to place the flashing, no flashing was ever installed on the original roof.

Paragraph 7.7.3 required the installation of sump pans at each of the eight drains. The specification stated that "[t]op surfacing shall not be applied until drain sump test requirements ... have been met." Karnes, unexpectedly, could not locate the proper lead when the time came for installation, and so constructed the roof around the drains. Each drain was enclosed within a two by four foot frame to which the lead sump pan was to be nailed. Karnes placed insulation up to the frame and laid the plies over the frame and into the throat of the drain. Although this was in direct contradiction of the terms of paragraph 7, defendant did not direct Karnes to cease the practice. The eight lead sump pans were finally installed by Karnes on February 4, 1983. On that same day, the inspector's log stated that water was leaking into the building from four of the drains and laying in the troughs in the metal decking beneath the insulation between the drains. On February 9, 1983, at the request of Mr.

Karnes, a representative of the organic felt manufacturer visited the job site. He noted that water was leaking from all eight roof drain sump pans, from the steel deck between the roof sump pans, and from a point fifteen feet from the north edge and sixty feet from the west edge of the roof. He recommended removal of the roof felts and wet insulation in the area between the roof sump pans, around the perimeter, and any sites that evidenced moisture or blisters. The removed areas should then be "shingle patched." Defendant determined that this recommendation would require patching thirty percent of the surface of the roof.

The ROICC, then-Lt. Schiffner, inspected the roof and found it to be so defective that it was beyond repair. To substantiate the extent of damage beyond a surface examination, seven samples were cut out of the roof and analyzed. All the samples showed ply separation, and one sample had water dripping from it when it was taken. Shortly thereafter, defendant ordered Westerchil to remove and replace the roof.

## DISCUSSION

Before addressing the merits, the court must address the relationship of the case at bar to *United States ex rel. Karnes Roofing Co. v. Westerchil Constr. Co. and Federal Ins. Co.*, No. 83–2893A (W.D.La. June 25, 1986). The parties in the present action included in the record the opinion in the aforementioned case, as well as the transcript and Receipt and Satisfaction of Judgment, but properly made no argument that that opinion was in any way binding or preclusive upon this court. The court deems it necessary, however, to review the district court decision and its possible application in light of the doctrine of issue preclusion.

Under the judicially developed law of collateral estoppel, once a court of competent jurisdiction has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.

*United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel, like the related doctrine of res judicata, serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Collateral estoppel is only appropriate in those instances when an issue reviewed in a subsequent proceeding is identical to the one decided in a prior action; the parties had a full and fair opportunity to litigate the issue; and resolution of the issue was essential to a final judgment in the first action. *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 703 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed. 2d 171 (1984).

 The scope of collateral estoppel has been broadened to include parties outside the original proceeding. In appropriate instances, collateral estoppel may be used as a shield by a new defendant against a plaintiff who was a party to the former litigation. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). Likewise, it may be used as a sword by a new plaintiff against a defendant who was a party in the prior suit. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979). The sword (offensive collateral estoppel) may not be wielded against a party who has not had a full and fair opportunity to litigate its claims, or used in a way that would be unfair to defendant. *Id.* at 329–31, 99 S.Ct. at 650–51. Likewise, offensive collateral estoppel does not apply to the United States unless a mutuality of the parties

exists. *Mendoza,* 464 U.S. at 159, 104 S.Ct. at 571; *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 169, 104 S.Ct. 575, 577, 78 L.Ed.2d 388 (1984).

 There was no preclusive effect arising from collateral estoppel in this instance. For the doctrine to take effect, the government would have to have been a party to the prior district court action. That was not the case. The Miller Act requires that that suits under the Act be brought in the name of the United States, so as to expand service of process and jurisdiction nationwide. 40 U.S.C. § 270b(b) (1982). The United States, however, is not entitled to notice of suit in such actions; it need not appear with counsel, it bears no costs, and it cannot be held liable. *See United States v. Randall & Blake,* 817 F.2d 1188, 1191 (5th Cir.1987). Unless the official party in whose name the action was brought or defended has some participatory or supervisory authority in the action, he cannot be included in the judgment.[4] "Identity of parties is not a mere matter of form, but of substance." *Chicago, R.I. & P. Ry. v. Schendel,* 270 U.S. 611, 620, 46 S.Ct. 420, 423, 70 L.Ed. 757 (1926). Rule 17(a) of the Federal Rules of Civil Procedure provides that "[e]very action shall be prosecuted in the name of the real party in interest.... [W]hen a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States." There is no question that Karnes was the real party of interest in the district court action; it engaged counsel, received notice, and actively defended its position without guidance from the United States. The United States was required by statute to become a captioned party to the suit, but its involvement in the case ended there. Indeed, the district court was without jurisdiction to bind the United States in its ruling, though

---

4. The Restatement (Second) of Judgments § 37, comment a, illustration 1, provides a poignant example of the estoppel effect on the government in Miller Act disputes.

A, a governmental agency, requires that B, a construction contractor, obtain a bond to secure payment of materialmen supplying material for the work. C, a supplier of material, sues B to obtain payment for material, bringing the action in A's name in accordance with the rule of procedure so permitting. In the absence of other elements of relationship between A, B, and C, the judgment is not preclusive against A in a subsequent action between A and C.

it may have wished to do so. 40 U.S.C. § 270b(b) (1982). Because the United States was only a nominal party to the prior district court action and has not had the opportunity to fully litigate its position in court, collateral estoppel does not apply. Thus, issue preclusion has no effect on the court's present determination.

The dispositive issue at bar is whether the roof built by Karnes was so defective that defendant was justified in requiring Westerchil to remove and replace the entire roof, instead of repairing it. That defects in the roof existed is beyond question. Credible evidence was presented that roofing plies had separated and that water had permeated the layers of felt, between the bottom felt ply and the insulation, and penetrated through at least a portion, if not all, of the insulation, and beneath the insulation to the troughs of the metal roof decking. There is no serious dispute that water entered at the perimeter of the roof where the flashing was never installed, where the lead sump pans had not been set into place, and to some degree through the roof itself. The court similarly has no question but that by the time defendant ordered the roof removed on March 2, 1983, it was irreparably damaged and had been so from early January, 1983.[5]

Defendant argued that the roof was so defective that it had to be completely removed and reinstalled at plaintiff's cost. The defects, according to defendant, were caused by Mr. Karnes' "sloppy, unprofessional" roofing techniques. Plaintiff and Karnes contended that the defects were minor and could have been easily repaired. Karnes, in fact, suggested several methods of repair, none of which were acceptable to defendant because they did not address all of the problems with the roof. Mr. Karnes testified that he could not address all of the problems because defendant never told him what they were. The court finds this dialogue specious. While it is true that defendant never gave Westerchil or Karnes a definitive written list of every deficiency, it is also true that there had been lengthy

discussions between Messrs. Karnes and Allen Westerchil, and Schiffner, Primeaux and Gutweiler about all of the problems that defendant had discovered with the roof. From testimony and the record, the court is positive that Westerchil and Karnes knew of defendant's objections to the roof, but chose to dispute them by generally denying the existence of problems.

The issues of the case and answers to the contentions of the parties are best addressed by a sequential investigation of the facts. Karnes reportedly began construction on a quarter of the built-up roof on Monday, December 13, 1982, and completed that portion during a light rain the next day. In constructing the roof, Karnes first placed insulation on the roof deck, then applied four plies of organic felt by hand, followed by a glaze coat to protect the roof from the elements until the final double coat of gravel could be applied. According to defendant, Karnes spread the glaze coat with a squeegee instead of a mop, which left thin and bare spots on the roof; hence, unprotected from the weather and in violation of paragraph 7, which specified that the glaze coat "shall not be less than 25 pounds per 100 square feet." Plaintiff did not address, much less, refute this charge. In addition, the court finds the plies Karnes laid in a light rain on December 14, were done in violation of the contract. Karnes also placed insulation on the metal roof decking when water was visible in the troughs. In so doing Karnes ignored paragraphs 6.2 and 7 of the contract that "all surfaces shall be … dry" and that the portion of the roof selected for construction on any given day was to be completed on that day. Dr. Robert Alumbaugh, an expert on built-up roofs employed by defendant, testified that the reason the contract called for each portion of the roof to be protected from rain and dew is that moisture in the roof leads unequivocably to early roof failure. Upon its discovery, defendant had to direct Karnes to remove the insulation in place and mop or otherwise dry the accumulated water.

5. The court agrees with Lt. Schiffner's testimony upon cross-examination that "[i]n hindsight … by the 6th of January the roof was already destroyed. We just didn't know it at the time."

No work was done on December 15, 1982, because of rain. Karnes next worked on December 16, 1982, using a felt laying machine to set the felt layers and asphalt in place. Under normal operation the felt laying machine would place hot asphalt on an existing ply and would unroll the next ply over the asphalt as it moved forward. The machine was to be followed by a broomer whose job was to embed the ply into the still hot asphalt, causing the asphalt to enter small perforations in the ply, thereby solidly laminating the newly placed ply on to the ply beneath it. The brooming was also intended to "push" air bubbles or voids to the edge of the ply and out so as to leave no pockets of air between the plies and create, *a fortiori*, total adhesion of the plies in compliance with paragraph 7, "[c]omplete application of the roofing system shall be without pockets or blisters." Use of the felt laying machine required that the broomer stand on, or otherwise hold, the beginning edge of the ply as the machine rolled forward laying the roll of felt. The court does not know whether the felt laying machine moved forward under its own power, but we do know that it did not automatically feed the new ply onto the hot asphalt; rather, it had to be pulled from the machine. Each roll of felt was 100 feet in length. Since the building was 130 feet long, and Karnes could only apply a portion of the roofing at any one time, only sixty to seventy feet of the roll, at the absolute most, would be laid in each application. Allowance was also required for areas cut to fit over the missing drain sump pans. No single "pass" of the felt laying machine could apply a full 100 foot roll.

Mr. Gutweiler testified that Karnes did not operate the felt-laying machine properly because the broomer would, on occasion, let 60–70 feet of the roll unwind before brooming. Mr. Gutweiler also recalled that Karnes broomed the plies with a

> ... [h]eavy bristle type broom, approximately 18 to 24 inches wide ... in the middle of the ply. Occasionally I would catch him leaving big wrinkles in it and I'd make him come back and broom out those wrinkles. I 'hollered' all the time about that.

The felt was three feet wide. Mr. Karnes unequivocally testified on recall that the brush was actually an aluminum rake, three feet wide. After personally observing both witnesses, this court is of the opinion that Mr. Gutweiler was incorrect; the "rake" was three feet wide; enough to "broom" the edges as well as the center of the ply.

Mr. Gutweiler also testified that Karnes had modified the machine so as to place the unrolling ply three to four inches above the deck, a height greater than designed. Thus, he testified, the felt would, on occasion, catch the wind as it left the machine, much as would a sail, and billow up waist high before settling onto the cooled asphalt to which it would not properly adhere. He allowed that this created air pockets between the plies that could not be completely broomed out.

Mr. Karnes refuted Mr. Gutweiler's testimony. Mr. Gutweiler's statement that the felt laying machine had been altered three to four inches was based upon weld marks that Mr. Gutweiler observed on its frames. Mr. Karnes admitted he had altered the machine, but only to raise the handle seven inches to make it more comfortable to operate. Conflicting testimony was heard on whether Mr. Karnes raised the roller that controlled the height at which the machine fed the plies to the roof. The court must give credence to Mr. Karnes' testimony, at least in part because Mr. Gutweiler had admittedly never seen a felt laying machine before and because his testimony was, to say the least, confusing. Mr. Gutweiler testified that when he first saw the felt laying machine he was of the opinion that the roller was supposed to "mash" the unrolling new ply into the freshly laid asphalt. He learned at some later date that it was to only lay the felt over the new asphalt and that it was the job of the broomer, not the roller, to laminate the plies. Mr. Gutweiler stated bluntly that a felt laying machine should never be used because when the ply is being placed by the machine, wind could get under the ply, cool the asphalt sufficiently so that proper

adhesion was not assured, and thus cause voids and potential blisters. He also testified that a felt laying machine was not used on the replacement roof. This testimony was refuted by his own daily log entry of June 7, 1983, which noted that he

> ... carefully inspected the felt layer [machine]. It is evident that the contractor had altered the adjustments so that the bottom roller does not roll the felt into the asphalt. The bottom roller is one and one-half to two inches from the roof deck.

Mr. Gutweiler's testimony that the roller was raised one and one-half inches to two inches from the roof deck also contradicts the three to four inches stated in earlier testimony. Further, the record indicated that the roller bar was supposed to be one and one-half to two inches from the roof deck. Apparently as late as the construction of the replacement roof, Mr. Gutweiler still did not understand the purpose of the bottom roller or how the machine was designed to function.

Both parties recognized that occasionally the wind would whip the felt ply up from the deck behind the felt laying machine. Messrs. Denman, Primeaux and Gutweiler stated that plies that caught the wind were lifted "four feet" or "waist high." Plaintiff's witnesses never saw it rise more than four to six inches from the roof. The contract required that the asphalt be placed on the roof at 350 to 430 degrees Fahrenheit. Dr. Alumbaugh testified that if the asphalt had cooled sufficiently, the next ply would not adhere to it properly no matter how well the broomer performed. Once the ply lifted from the deck behind the felt-laying machine, wind could cool the asphalt, perhaps enough to prevent proper adhesion. Lack of adhesion would be an invitation for "air, moist air or liquid water" to enter the void and cause a blister to form.

Blisters are the bane of a good roof. A blister, or raised bump, is usually created when an amount of air or water, or even one piece of gravel, is trapped between two plies of roofing felt. While a small amount of trapped air is not usually too worrisome, in reality, any trapped material has the potential to cause damage to the roof. It would not be unusual for temperatures to rise on a built-up roof in Louisiana from 175 to 180 degrees Fahrenheit on a hot summer day. The air trapped in the blister would then expand, causing the blister to grow in size, thereby separating the plies even further. If the blister contained water, the potential for damage would be much greater. If water permeated between the plies and was heated, the resulting vapor could grow to 1,500 times its original size, causing the plies to further separate and erupt or burst, thereby destroying the watertight integrity of the roof. Multiple blisters obviously increased the potential for eventual leakage. Defendant voiced a valid concern that Karnes' construction practices could result in numerous blisters and related defects.

The effect of the whipping ply must be considered hand-in-glove with brooming. Different witnesses testified on how closely they observed the broomer behind the felt laying machine and opined, depending on the distance, that the asphalt had or had not cooled to a point where it would no longer be possible for the broomer to properly laminate the top plies. The court surmises that each witness represented the facts to support his best case. Defendant estimated the felt lifted four feet. It may have, on occasion, but the court finds this to be unlikely. Likewise, plaintiff's testimony is just as open to question. If the roller was set two to three inches above the level of the roof and the broomer was far enough behind, the felt may have lifted only four to six inches from the deck on occasion.

The only fact on this issue to which the parties agreed was that any "billowing" occurred during gusts of wind. The climatological data, however, showed that the wind only gusted on work days between 7 and 13 m.p.h.. On December 13, 14, 16, 17, and 20, 1982 the highest winds for each day were, respectively 7, 13, 11, 10, and 8 m.p.h.; in reality, not much more than a breeze. Dr. Alumbaugh testified, based on his memory of studies performed by the National Bureau of Standards, that asphalt would cool to a point where proper lamina-

tion could not be achieved after five to ten seconds of exposure to winds of ten to thirty miles per hour at a temperature between forty and fifty degrees Fahrenheit. Between December 13 and 20, 1982 those conditions were not concurrently present. This further buttresses the court's conclusion that the lifting of the ply after leaving the felt laying machine must have occurred only a few times and due to the weight and tension on the ply it could not have lifted as high as four feet.

All of this, however, is of relatively minor importance because all of the witnesses qualified their testimony by stating that the lifting ply together with the gust of wind "could" have cooled the asphalt to a point where it would no longer permit lamination of the plies. No witness did, or could, testify that the asphalt had, in fact, cooled to that point; neither could they pinpoint to the satisfaction of the court what that temperature would be. The single effect of this issue is a possible correlation with the seven test samples in which a lack of lamination between the plies was found. Too many other factors, however, could have prevented lamination to place the blame on "billowing" plies and cooling asphalt as the plies emerged from the felt laying machine.

Karnes continued work on the roof until December 20, 1982, when all the plies had been laid and a top glaze coat applied. At that time plaintiff requested permission to gravel the roof. The request was denied by defendant because certain condition precedents to applying the gravel coats had not been met. Paragraph 7, *et seq.* required that the parapet walls be completed, flashing installed, all drains be in place and approved by defendant, and all drain sump test requirements satisfied before the top coat of gravel could be applied. None of the prerequisites had been met. Paragraph 7 also required that the roofing system be inspected and approved or repaired before application of the gravel coats because the gravel would hide problem areas. Karnes left the roof that same day because it had completed all the work that it could at that time. Karnes and Westerchil, however, failed to provide any temporary wa-

terproofing to the roof other than to construct water cutoffs, per paragraph 7.5, which were designed to temporarily protect the insulation "when rain or snow was imminent." This action proved to be deficient. On December 26 and 27, 1982, England Air Force Base was subjected to torrential rains which caused severe local flooding. Sometime shortly after the first of the year, Westerchil nailed sheet plastic to and over the edges of the roof to prevent more water from running under the roof at its unprotected perimeter. Those efforts, however, were too few and too late.

In early January, 1983, Mr. Gutweiler, apparently the only on-the-scene witness for defendant with any reasonable knowledge of the construction of built-up roofs, stated that the roof was the worst he had ever seen. Shortly thereafter, Mr. Gutweiler went to the roof and outlined apparent defects, mainly blisters. According to his testimony, he visited the roof every day, discovered new blisters or other "defects," and painted rings around them until they were so numerous that no purpose would be served by identifying more. Both Mr. Gutweiler and Mr. Primeaux testified that they saw well over a hundred such defects on the roof. The Assistant ROICC, then-Ensign Denman, also saw more than a hundred blisters on the roof. It is not clear whether Mr. Denman and Mr. Primeaux were counting blisters independently or just those areas marked by Mr. Gutweiler. In addition, in its review of Mr. Gutweiler's statements at trial, the court notes that critical portions of Mr. Gutweiler's testimony cannot be given much credibility. He appeared confused. He equivocated in his testimony and made statements contrary to what he had given in the district court proceedings. While his attorney deftly led Mr. Gutweiler to correct himself, the damage was done to his credibility. It was all too apparent to the court that Mr. Gutweiler and Mr. Karnes, both apparently strong-willed individuals, obviously had a personality clash. The rift between the two was so great that shortly after construction started, Mr. Gutweiler would speak only to Westerchil about Karnes' construction of

the roof. Their antipathy towards each other was very apparent at trial.

Similarly, Mr. Karnes, quite unbelievably, declared that he saw no blisters, though he did admit to seeing twenty to thirty "finger blisters," also known as "fishmouths." Mr. Karnes defined fishmouths as not being true blisters because there was no air or water trapped in them; but rather they were wrinkled ply edges—"an upturned kink"—which is common, and easily repairable. Mr. Robert Allen, construction superintendent for Westerchil, testified to seeing only twenty to thirty blisters, but admitted that more appeared later. George Marsh, a knowledgeable witness in the area of built-up roof design, agreed with Mr. Karnes in that he saw fishmouths, and with Mr. Robert Allen as to the blisters. Mr. Marsh also testified that no roof is perfect and that some blisters were bound to appear regardless of how carefully the roof was built. His suggested solution was to cut and repair the fishmouths and open the internal blisters with an ice pick or similar instrument, heat the roof to 150 degrees Fahrenheit and roll it flat with a 20–pound weight. When there was water penetration, Mr. Marsh simply suggested removing and replacing the wet plies and insulation. The sum of his testimony was that the roof was prime for repair, not replacement. The court notes that Mr. Marsh was employed by Westerchil as its "expert."

The ROICC, then-Lieutenant Schiffner, who had been on leave during construction of the roof, visited the roof for the first time on January 5, 1983. Upon his inspection, Lt. Schiffner saw the blisters already marked by Mr. Gutweiler, new blisters that Mr. Gutweiler was marking, no flashing, no sump pans, and no proper temporary protection from the elements. He stated that he saw a number of other defects, *i.e.*, fishmouths, water pools, water and ice in the gaps in plies facing upwards at the parapet walls, blisters up to eighteen inches across, some of which spurted water when stepped on, and no glaze coat in certain areas. He testified that the worst defects were blisters close to the parapet walls but that other blisters were visible

across the length and breadth (about 130 by 130 feet) of the roof, averaging one every six to ten feet. Everyday new blisters appeared. It is not known whether Lt. Schiffner noticed all of the defects he described by himself or whether they were pointed out to him by Mr. Gutweiler. While it is true, as plaintiff elicited, that Lt. Schiffner's only experience with built-up roofs was limited to observing the repair of a few, the court also believes that one need not be an expert on built-up roofs to know that the sight of standing water and ice between and under the plies and blisters that "popped" and squirted water when stepped on indicated the existence of serious defects. Lt. Schiffner certainly knew the terms of the contract and had sufficient common sense to know that the roof fell short of the contract requirements.

On January 6, 1986, Lt. Schiffner wrote a letter to Mr. Allen Westerchil, informing him of the defects he observed. He invited Mr. Westerchil "... to submit a written proposal that will correct this unsatisfactory condition and provide a suitable finished product," and stated, "[n]o payments will be made for unacceptable work." Mr. Westerchil forwarded Mr. Schiffner's January 6 letter to Mr. Karnes. On February 22, 1983, Mr. Karnes responded to Mr. Westerchil, in part:

It should be obvious to even ROICC that a detailed examination of the roof *surface* will reveal the problem areas.

This surface investigation will be carried out by myself, and the areas I find unacceptable or potentially harmful will be cut and examined further. If moisture is found, the wet materials will be removed and replaced.

The felt on the parapet wall will be cut back and removed; three plies of asbestos felt placed in flashing cement will then be installed.

(Emphasis in original). On the same day Mr. Karnes wrote a second letter to Mr. Westerchil, as follows:

I propose to inspect the roof visually in search of the "defects" pointed out by ROICC.

"Fishmouths", if any, will be cut in half and a ply of felt mopped on top of the entire fishmouth area.

"Blisters", if any, will be cut open, allowed to dry or dried by a torch. A ply of felt will then be placed over the opened area.

The parapet walls will receive the 3 plies of asbestos felt in a coating of plastic cement, after the roofing felts have been cut down to the top of the cant. Any wet material encountered will be replaced.

* * * * * *

Other than a *few* turned-up edges, [and] some minor ridges, this roof is only *incomplete, not* defective.

(Emphasis in original). These letters reflect in great part Mr. Karnes' attitude towards defendant and his attendant arrogant behavior, which is indicative of the distance between the parties' respective positions. It is apparent, for example, that a detailed examination of the roof surface, as noted in Mr. Karnes' initial letter of February 22, clearly would not have revealed all of the problems with the roof. A surface examination would not point out small blisters, lack of lamination, and wet plies and insulation. Moreover, Mr. Karnes stated that he, not defendant, would inspect the roof, and if he found any defects then, and apparently only then, would he make the necessary repairs. In his second letter of February 22, Mr. Karnes stated that he would replace any fishmouths and blisters, if there were any. It should be noted that by February 22, 1983, plaintiff had already recognized that blisters existed. Even Mr. Karnes admitted the existence of fishmouths. On January 11, 1983, Mr. Karnes proposed repairing fishmouths by removing the curled edges, drying the area with a blowtorch or other method and replacing the cutout edges. He did not address the blisters. That Mr. Karnes qualified that he would repair blisters and fishmouths, "if there were any" only acerbated the problem.

Later, by letter of March 7, 1983, Mr. Karnes proposed repairing any blisters in the roof by rolling them with a 300 to 400 pound roller to "flatten" them. On March 15, 1983, Lt. Schiffner rejected the "rolling" solution as unacceptable, not used in the trade, and, citing Dr. Alumbaugh, ineffective and potentially damaging to the insulation. The court must agree with Mr. Schiffner's rejection of plaintiff's plans. If the blisters in the roof were caused by the lack of adhesion of one ply to another, it is axiomatic that there was either no asphalt in the area or that the asphalt had cooled to a point where the plies could not, under any conceivable circumstances, be properly laminated by simply rolling the blister. Rolling would only flatten and spread a blister. Mr. Marsh's testimony that the blisters could be "pricked" and rolled with a twenty pound weighted roller is just as ludicrous. It is no small wonder that defendant rejected plaintiff's repair proposals.

To clarify the extent of the damage to the roof, defendant requested, pursuant to paragraph 10.1, that samples be cut from the roof for evaluation by Mr. Kenneth Gorsha, an expert employed by defendant for that purpose. Mr. Karnes cut seven samples, 36 inches by 4 inches, from random areas of the roof. Of the samples taken, only one had water actually dripping from it when it was cut from the roof. The other samples did not show any unanticipated amount of moisture. Upon examination, however, every sample showed significant ply separation.

After reviewing the substance of the transcript, it is apparent to the court that the testimony from all witnesses, both lay and expert, directed towards Karnes' construction methods, was so disparate that the court can only conclude that very little if any weight can be given to any one individual's testimony. But documentary evidence and the sum of the testimony provides the court with sufficient grounds upon which to reach a proper conclusion. It is clear that by mid-January 1983, the roof was so defective that the only proper and reasonable course of action was to remove the first roof and rebuild it from the metal steel decking up. All of the samples taken from the roof showed dela-

mination, or no lamination, and, as was discovered when the roof was removed by order of Lt. Schiffner, water standing in the troughs of the metal steel decking beneath the insulation and felt plies. Whether that water had gathered there because of poor workmanship away from the perimeter of the roof is wholly speculative and need not be addressed. What is important is that the roof next to the parapet walls, located at the opposite ends thereof, was unfinished, and, more significantly, was unprotected from the elements; primarily the heavy downpour which occurred on December 26 and 27, 1982.

Defendant's frustration with the roof was best stated in Lt. Schiffner's letter of February 14, 1983 to Westerchil. In that letter Lt. Schiffner reviewed several of Westerchil's and Karnes' actions against pertinent contract documents and found them lacking in the following areas:

*Submittals and Shop Drawings*—your attention is invited to Contract General Provisions number 9, 15, 45, 86, 87, and 88 which relate to submittals and shop drawings. Briefly stated[:]

The prime contractor will coordinate and review submittals/shop drawings for accuracy and completeness, certify that they satisfy the contract requirements, and ensure complete submission allowing sufficient time for review by the contracting officer. Articles installed without required approval risk subsequent rejection.

*Asphalt*

Test results provided on Macmillan Ring–Free Oil Co. Type I dead level asphalt did not indicate the maximum permissible temperature or best application temperature range. No information was submitted on Type III (steep) asphalt, but it was used as required to install the roof insulation. None of the asphalt was delivered with the required manufacture's information on the container; therefore, we have no way of checking that the asphalt being incorporated on the job is the same asphalt that was tested. Reasonable doubt exists on this subject since three different brands of dead level asphalt (Macmillan Oil, Bird & Son, and one unmarked brand) are staged on the job site.

*Roofing System*

The submittal for the Celotex roofing system did not include the referenced "General Requirements" or "Roof Deck Requirements". It does state that Celotex disclaims responsibility for the performance of commercial roofing systems that don't use Celotex asphalt.

No information was submitted on the cant strip or bituminous plastic cement. Information on the roof walkway planks and on the lead sump pan were not submitted until 4 February 1983. This was after the pans were manufactured for installation. Complete submittals were not made for the metal flashing and gravel stops.

*Construction Quality Control*—your attention is invited to Contract General Provisions 10, 30, and 43 which relate to quality control of construction. Briefly stated;

The contractor has the duty to maintain adequate inspection of all the work to ensure conformance with the contract requirements. Government inspection is for the sole benefit of the government and does not relieve the contractor of his quality control responsibilities. Defective work will be replaced at the contractor's expense.

Your subcontractor has demonstrated little interest in complying with the project specifications. He has been observed violating or attempting to violate the following specification sections;

*Section 07000*—Built up Bituminous Roofing

Para 4 Materials were not delivered with appropriate data on the containers (i.e. asphalt). Roll materials were not stored above 50°F.

Para 6.1 Flashing and counterflashing were not coordinated with the built-up roof application. This has allowed water to enter the roof system along the perimeter parapet and around the roof projections.

Para 6.5 Calibrated immersion thermometers were not available to verify asphalt application temperature.

Para 7 On three (3) occasions the contractor attempted too much work and was not able to provide the required one-day application of insulation, base sheet, three roofing plies, and glaze coat. A glaze coat application was attempted in the dark. The requirement for voidless coverage and complete penetration of the bitumen into the felt layers above and below was not satisfied. This is demonstrated by the ply separations that were revealed by the lab tests. These pockets and blisters are not acceptable.

Para 10.1.6 When the cut tests were taken by Geological Lab on 24 January 1983, I took a zerox [sic] copy of the applicable specifications (para 10) on the roof with me. Paragraph 10.1.6 specifies the method of patching the cut test areas, and I personally gave this to Mr. Karnes after all of the cut tests had been completed. We then discussed his proposed method of repair, which was identical to paragraph 10.1.6. I left the roof and did not watch the actual patching. If Mr. Karnes had complied with paragraph 10.1.6 the patch would be solid, concave [sic] [6] above the plane of the surrounding roof area, and show a full width of the roll as a top sheet. The existing patches are indented in the spot where the cut test was taken. The top sheet is 18–24 inches wide; not a full width. This fails to comply with the specification.

Table 2 The maximum temperature for type I asphalt is 425°F. The maximum temperature for types II, III, and IV asphalt is 475°F. During the application of the roof insulation, the subcontractor was authorized to heat the *steep* asphalt to 475°F. We discovered later that the type I asphalt had also been heated to 475°F; 50°F above the maximum.

*Section 07241*—Roof Insulation

Para 6.4 Insulation joints do not always occur on a solid bearing surface.

Para 5.1.2 The roofing contractor attempted to apply roof insulation when moisture was visible on the roof deck. He mopped up the water after being directed by the government.

My original contention on 6 January 1983 that the roof does not comply with the contract requirements was based on a visual inspection that revealed blisters, fishmouths, and free water leaking from the roofing membrane. This position concerning the blisters has now been supported by lab tests which document ply separation in 100% of the seven samples. The existence of free water has been documented by two cut tests (sample # 2 had free water in the sample and sample # 7 had free water between the plies adjacent to the sample).

Your failure to flash and counterflash in conjunction with the roofing application has allowed water to get under the roofing insulation and leak into the building interior. The installation of the roof drain sump pans was obviously inadequate since they are leaking directly into the building. The sump pans are also leaking on the steel roof deck, which then drips into the building.

Throughout this ordeal you have failed to acknowledge the existence of a defective roof and have insisted that the roof is adequate. A roof that leaks; has fishmouths, voids, blisters, and ply separation; and free water in the membrane does not satisfy the contract documents. It will not be accepted until these deficiencies are corrected.

The court was satisfied with Mr. Karnes' experience as a built-up roof contractor, but from his demeanor at trial, and his two letters of February 22, 1983, the court finds that Mr. Karnes was determined to build the roof his way regardless of whether that conflicted with the requirements of the contract. It was equally clear that the

**6.** Because of the language in the following sentence, it is believed that Lt. Schiffner meant to say "convex," not "concave."

responsible government officers, with the possible exception of Mr. Gutweiler, were unfamiliar with how a built-up roof was to be constructed, especially if materials and methods were used that were permitted, though different from those described in the contract or shown in the preconstruction film. In the final analysis, however, the court must lay the blame at the doorstep of Westerchil, the prime contractor to whom Karnes was directly responsible.

It will be remembered that the contractor was to complete the roof in sections, including the flashing which led from the felt plies and up to and over the parapet walls, and that all materials to be used on the roof were to be submitted to defendant for approval prior to its use. Westerchil was to have constructed the parapet walls before Karnes applied the organic felt plies. The flashing was to have protected the edge of the roofing plies from water penetration. In reality, the parapet walls were not built by Westerchil and the flashing never installed by Karnes.

The reasons why the flashing was not installed were hotly debated by both sides. Mr. Gutweiler testified that he never discussed flashing with Mr. Karnes, but that he did with Mr. Allen. Mr. Allen, on or about December 20, 1982, informed defendant that asbestos flashing was no longer available and that Mr. Karnes wanted to use fiberglass in its stead. Mr. Gutweiler noted that the contract called for asbestos, but stated that he would discuss the problem with Mr. Primeaux. Mr. Gutweiler and Mr. Primeaux concluded that if Karnes wanted to use fiberglass flashing it could, but the flashing would have to be submitted by plaintiff for approval. About ten minutes later, Mr. Gutweiler informed Mr. Allen that Karnes could, if it wished, install fiberglass flashing at plaintiff's risk and submit the material to defendant for approval at a later date. At the time Mr. Gutweiler and Mr. Primeaux apparently knew that fiberglass flashing was acceptable in the industry and that it would be approved, as indeed it was for use on the second deck. Neither Westerchil nor Karnes ever presented an alternative flashing to defendant for approval. Neither did they choose to install the fiberglass flashing.

Plaintiff argued, and Mr. Allen Westerchil testified, that flashing material did not have to be submitted for approval because paragraph 10.5.b. did not "list base flashing as a built-up roofing system component." Paragraph 86 of the General Provisions of the contract entitled "PROPOSED MATERIAL SUBMITTALS REQUIRED OF CONTRACTOR," states that,

[p]roposed material submittals required of the Contractor shall be made allowing sufficient time for processing, reviews, approval, and procurement before the Contractor is ready to sue the material. No material shall be used prior to written approval.... (f) [s]ee individual technical sections for additional information.

Section 07000 is the "individual technical section," referenced above, for the built-up roof. Paragraph 10.5 of section 07000 states:

Samples and Descriptive Data: Before delivery of any materials to the building site, the following samples and descriptive data shall be submitted and approved.

a. Roof surfacing aggregates—one quart sample.

b. Components of built-up roofing system—manufacturer's data.

c. Walkway plank or tread—manufacturer's data.

c. [Sic] Prefabricated sump pans—shop drawings.

It is clear to the court that the items to be submitted for approval under paragraph 10.5.a. and both c.'s are inapplicable to this issue. It is just as clear that 10.5.b. is. The court heard no rational testimony or argument that the flashing was not included in the phrase "[c]omponents of built-up roofing system," and in the opinion of the court, flashing was an integral component of the built-up roof. In fact, according to Mr. Karnes on cross-examination, either he or plaintiff had submitted in a timely manner asbestos flashing to defendant for approval pursuant to paragraph 10.5.b. The

court finds that the language of paragraph 10.5.b. was not ambiguous and could not, under any logical or reasonable interpretation, be read to exclude flashing. An ambiguity exists only when a contract specification is subject to more than one reasonable interpretation. *Opalack v. United States,* 5 Cl.Ct. 349, 359 (1984); *see S.W. Aircraft, Inc. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977). That is not the case in this instance. By not submitting the manufacturer's data on the fiberglass flashing, plaintiff placed itself in the precarious position of having to risk the installation of unapproved fiberglass flashing or installing no flashing at all. Unfortunately for Westerchil, the latter course was followed. What makes this situation all the more regrettable is that fiberglass flashing was fully acceptable in the industry and that approval was almost certain. Why no submissions were made is beyond comprehension. The court thus finds that the contract did not prohibit the use of fiberglass flashing, absent submittal and approval. The contract, however, did lay the risk upon the contractor that if the proposed alternative material was found by defendant to be unacceptable, it would have to be removed and replaced at the contractor's expense.

Westerchil's failure to build the parapet walls, beyond the dispute over the type of flashing to be installed, sounded the death knell to plaintiff's position. The contract required Westerchil to coordinate all work on the project so that one phase did not unreasonably interfere with another. The record is clear that the parapet walls were not completed by Westerchil prior to the time Karnes began work on the roof. Thus the court is left with only one conclusion; even if Westerchil had decided to risk the use of fiberglass flashing, it could not have been installed because the parapet walls had not been built to a point where the flashing could have been installed. In addition, Westerchil, via Karnes, failed to provide effective temporary protection from the elements. The court finds that by the time Westerchil nailed sheet plastic to the headers on the parapet walls to prevent leakage onto and beneath the plies, water

had already invaded the areas between the upward pointing plies at the parapet walls and into the troughs in the metal roof decking. The court also notes that the areas around the missing sump pans were likewise not waterproofed, neither temporarily nor permanently. As a result, water from the preceding drizzles and torrential rains flowed easily between and under the plies and insulation and into the building. The roof was not watertight.

## CONCLUSION

■ It is axiomatic that the government contracted and paid for a properly watertight roof that would remain so for a reasonable number of years and that the government was entitled to the benefit of its bargain. Upon reflection of the issues, including observation of the witnesses as they testified and a study of the documentary record, the court finds that defendant acted within the scope of its authority when it forbade Westerchil to repair the defects on the roof and instead directed Westerchil to remove and rebuild the roof.

Westerchil knew that the roof was defective, as did Karnes; it was to the degree or magnitude of the defects that the parties in this case differed. It is possible, as Mr. Karnes testified, that he had constructed built-up roofs on other projects containing many or even more defects than on the roof in question and corrected those defects to the owner's satisfaction by repairing them, as opposed to replacing the entire roof. The key to defendant's right under the contract was the sentence in paragraph 7, to wit: "Complete application of the roofing system shall be without pockets and blisters." Plaintiff downplayed the problems, positing that they were easily repairable with no diminishment in the watertight integrity of the roof. Westerchil, with Mr. Karnes' support, argued that the roof was unfinished, not improperly constructed, and therefore plaintiff should not be held accountable. The court cannot accept plaintiff's position. As has been discussed, Westerchil did not schedule the work properly so that flashing could have been installed when needed,

even if it had been approved. The contract required that flashing be applied as soon as each perimeter section was finished, but Karnes could not do so because the parapet walls were not complete.

Turning to more subjective areas, it is clear to the court that Mr. Schiffner's description of the roof, as he saw it for the first time in early January 1983, was accurate. The court finds credence in defendant's statements that defects were noted throughout the roof with many clustered around the perimeter. To reiterate, the ROICC saw over a hundred defects, including fishmouths, standing water, and ice between open plies facing upwards at the parapet walls, no flashing, no sump pans, no glaze coat in spots, and, more importantly, blisters up to eighteen inches across, some of which squirted water when stepped on. With hindsight, the roof was totally inadequate. By personal inspection, reports of his inspections, and with the advice of roofing experts, Lt. Schiffner properly determined that plaintiff's suggested repairs were inadequate and that the roof needed to be removed and rebuilt. While it is true that this decision was made before the original roof was removed and the full extent of the damage was not known, the information available to Lt. Schiffner at the time was nevertheless more than sufficient to support his determination that the roof was damaged beyond repair. The court notes that the plies had separated in all seven of the samples taken from the roof; no flashing had been installed to protect the perimeter of the roof thereby resulting in water-filled blisters; the troughs in the metal decking contained water beneath the insulation; the sump pans had not been installed nor properly waterproofed; and torrential rain fell on the roof in its unprotected, incomplete, state. Had Westerchil been permitted to simply repair the roof, defendant would not have received a roof of the quality for which it contracted. The repairs would have been so extensive that the roof would be a true hodgepodge of one repair after another.

For the reasons stated above, the court concludes that defendant acted properly in requiring a rebuilt roof, notwithstanding the decision in *United States ex rel. Karnes Roofing Co. v. Westerchil Constr. Co. and Federal Ins. Co.*, No. 83–2893A (W.D.La. June 25, 1986). The complaint is dismissed and the Clerk is ordered to enter judgment in favor of defendant. No costs.